UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GEORGE HARRIS,

        Plaintiff,

    v.

VANCE INTERNATIONAL, INC.,

        Defendant.
_____/

No. C-07-5991 EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**(Docket No. 22)**

        Plaintiff George Harris has filed suit against Defendant Vance International, Inc., his former employer, for employment discrimination based on race. Currently pending before the Court is Vance's motion for summary judgment or, in the alternative, for summary adjudication.

## I. FACTUAL & PROCEDURAL BACKGROUND

### A. Claims at Issue

        As a preliminary matter, the Court notes that, in his complaint, Mr. Harris originally claimed discrimination not only on the basis of race, but also on the basis of sex, age, and religion, all in violation of the California Fair Employment and Housing Act ("FEHA"). *See* Compl. ¶ IV. However, at his deposition, Mr. Harris dropped his claims for discrimination on any basis except for race. *See* Harris Depo. at 256. As to that claim, Mr. Harris claims both disparate treatment on the basis of race as well as a racial hostile work environment.

        As an additional matter, the Court notes that, in his complaint, Mr. Harris originally claimed that Vance's termination of his employment constituted not only discrimination but also retaliation. *See* Compl. ¶ V. In its motion for summary judgment, Vance argued that there was no genuine

dispute of material fact that it did not retaliate. Mr. Harris did not address this argument at all in his opposition. Accordingly, the Court deems the retaliation claim to have been dropped by Mr. Harris as well and Vance is entitled to summary judgment on the claim.

In short, what the Court is left with at this juncture are only claims for (1) disparate treatment based on race and (2) a racial hostile work environment.

B.  Mr. Harris's Employment at Vance

Much of the evidence regarding Mr. Harris's employment at Vance is in dispute. There are, however, some facts that appear to be undisputed. They are as follows.

(1) Mr. Harris is African American.

(2) Vance is a security firm and employed Mr. Harris as a security officer from March 22, 2006, to April 12, 2007. *See* Martinez Decl. ¶ 3; *see also* Compl. ¶¶ III, V (alleging that he was hired in March 2006 and then terminated on or about April 12, 2007).

(3) During his employment with Vance, Mr. Harris worked at the Richmond San Francisco Chronicle site. *See* Martinez Decl. ¶ 3; *see also* Amie Decl. ¶ 2 (noting that Mr. Harris was employed at that site).

(4) During his employment with Vance, Mr. Harris's direct supervisor was, first, Natalie Amie and then, when she resigned, Paulette Murphy. *See* Martinez Decl. ¶ 4; *see also* Amie Decl. ¶ 1 (stating that she employed by Vance from 2005 to 2007 as manager of all Vance security officers at the Richmond San Francisco Chronicle site); Harris Decl. ¶ 10 (stating that his manager was Ms. Amie). Ms. Murphy began to supervise Mr. Harris as of January 8, 2007. *See* Martinez Decl. ¶ 9. Ms. Murphy is African American. *See* Martinez Decl. ¶ 4.

(5) Michael Martinez was hired by Vance on January 4, 2007 – *i.e.*, shortly before Ms. Murphy became Mr. Harris's supervisor. *See* Martinez Decl. ¶ 1; Martinez Reply Decl. ¶ 1. He was hired and has since served as the project manager of security for the San Francisco Chronicle, including the Richmond site. *See* Martinez Decl. ¶ 1; Martinez Reply Decl. ¶ 1. "[His] duties include overseeing all of the security operations for the Richmond San Francisco Chronicle Site. This includes the hiring of employees, training of employees,

conducting new hire orientations, disciplining employees, and serving as a liaison between the San Francisco Chronicle and Vance." Martinez Decl. ¶ 1; Martinez Reply Decl. ¶ 1.

What is disputed, of course, is whether Mr. Harris suffered employment discrimination while he was working at Vance. According to Mr. Harris, Vance terminated him on the basis of his race, and he suffered a racial hostile work environment while working there. Mr. Harris claims that Mr. Martinez was the person at Vance responsible for the disparate treatment and the hostile work environment.

Vance disputes the evidence of discrimination offered by Mr. Harris. According to Vance, Mr. Harris had a history of employment problems which eventually led to his termination on April 12, 2007. Some of these alleged problems predated Mr. Martinez's employment with Vance. Mr. Harris challenges each of the alleged problems, both as an evidentiary matter and as a factual matter.

## II. **EVIDENCE**

A. Evidence of Discrimination

In conjunction with the summary judgment motion, Mr. Harris has offered the following evidence of discrimination to which certain evidentiary objections were made by Vance.[1]

(1) According to Mr. Harris, Mr. Martinez referred to African American employees as "duckets" and "[h]e said he called us 'duckets' because all we were interested in was our salary, unlike employees of other races." Harris Decl. ¶ 12. Vance objects to this evidence, claiming that this statement in his declaration is inconsistent with his deposition testimony and therefore his declaration must be considered a sham. *See* Def.'s Obj. at 7 (No. 10). The objection is overruled. It is true that, in his deposition, Mr. Harris did say that the word "duckets" means money, *see* Harris Depo. at 52; in other words, Mr. Martinez was not calling African Americans "duckets." However, the overall thrust of the deposition testimony and the declaration testimony are consistent – *i.e.*, that Mr. Martinez used the word "duckets" when he was talking to African Americans specifically. Vance also argues that the evidence is immaterial because the word "duckets" is race neutral. As indicated above, that argument is

---

[1] The Court addresses only those evidentiary objections that are relevant to its resolution of Vance's motion for summary judgment.

3

|   |   |
|---|---|
|   | misplaced.  Mr. Harris's claim is that the term was used specifically with reference to African Americans, and not other races; therefore, there is a connection to race.  Finally, Vance disputes that Mr. Martinez ever used the word.  *See* Martinez Reply Decl. ¶ 6 ("In his declaration plaintiff claims I told him I referred to African Americans as 'duckets' because all they care about is money.  I never made that statement and do not even remember using that word at all."). |
| (2) | According to Mr. Harris, Mr. Martinez used the word "gofers" to refer to two employees who are African American.  *See* Harris Depo. at 48.  Mr. Harris learned of this incident through another Vance employee after he filed his lawsuit.  *See* Harris Depo. at 48.  Mr. Harris does not testify that he himself heard Mr. Martinez use this term.  Nor does he testify he had heard of the incident prior to this lawsuit. |
| (3) | According to Mr. Harris, Mr. Martinez removed an African American security officer by the name of Ronald Tizon, purportedly because of his body odor "but there was nothing wrong with him except for his race."  Harris Decl. ¶ 8.  Vance asserts that the human resources database shows that "there has never been an employee named Richard Tizon who worked at Vance."  Martinez Reply Decl. ¶ 4.  There was an employee named Richard Tizenor who was a security guard at Vance but his employment was terminated *before* Mr. Martinez started working for Vance.  *See* Martinez Decl. ¶ 4 ("Richard Tizenor's employment with Vance terminated on September 27, 2006, about three months before I began working at Vance.").  Mr. Harris has not rebutted Vance's evidence. |
| (4) | According to Mr. Harris, another employee at Vance, Charles Brooks, who is Caucasian, violated work policies all of the time but did not get terminated; instead, he was just written up.  *See* Harris Depo. at 62, 261.  Vance claims that, at his deposition, Mr. Harris testified that he did not know the nature of any discipline Mr. Brooks may have received.  *See* Mot. at 12 (citing Harris Depo. at 173).  This is not entirely accurate.  Mr. Harris stated that he was not aware that Mr. Brooks's discipline included suspension.  *See* Harris Depo. at 173.  Subsequently, Mr. Harris testified that he knew that Mr. Brooks got written up a few times. *See* Harris Depo. at 261. |

4

1  (5)  According to Mr. Harris, Mr. Martinez preferred to have Hispanics replace African
2       Americans and in fact replaced Mr. Harris after he was terminated with a Hispanic by the
3       name of Jose Morales.  *See* Harris Decl. ¶ 9; Harris Depo. at 175.  Vance claims that Mr.
4       Harris is mistaken.  According to Vance, Mr. Martinez actually hired another African
5       American to fill Mr. Harris's position, a woman by the name of Lucy Williams.  Ms.
6       Williams was hired on May 7, 2007, a few weeks after Mr. Harris's termination on April 12,
7       2007.  *See* Martinez Reply Decl. ¶ 3.  Vance also claims that Mr. Harris may be thinking
8       about a security officer named Jacob Morales but that individual was hired a few weeks
9       *before* Mr. Harris's termination.  *See* Martinez Reply Decl. ¶ 3 (claiming that Jacob Morales
10      was hired on March 26, 2007).  However, the human resources database "excerpt" on Jacob
11      Morales, which was provided by Vance, does show that there was a person named Jose
12      Morales who was, at some point, an employee of Vance.  *See* Martinez Reply Decl., Ex. P
13      (database showing Jose R. Morales's name underneath Jacob A. Morales's name).  There is
14      no evidence, however, as to his date of employment or position.
15 (6)  According to Mr. Harris, on at least one other occasion, Mr. Martinez fired an African
16      American and replaced him with a Hispanic – someone with the last name Hernandez.  *See*
17      Amie Decl. ¶ 4.  Vance claims that there was an Ivan Hernandez who was hired but Ivan
18      Hernandez was hired on September 5, 2006, *i.e.*, *before* Mr. Martinez started working for
19      Vance.  *See* Martinez Reply Decl. ¶ 5.  However, the human resources database "excerpt"
20      provided by Vance on Ivan Hernandez shows that there were other employees with the last
21      name of Hernandez.  *See* Martinez Reply Decl., Ex. R (database showing at least three other
22      employees with the last name Hernandez).
23 (7)  According to Mr. Harris, Mr. Martinez also showed his favoritism for Hispanics and his
24      anitpathy toward African Americans by changing work schedules to favor Hispanics as
25      against African Americans.  *See* Amie Decl. ¶ 4.
26 (8)  According to Mr. Harris, not only he himself but other former Vance employees, such as Ms.
27      Amie and Henry Ruiz (previously a site trainer for Vance), believed Mr. Martinez to be anti-
28      African American.  *See, e.g.*, Harris Decl. ¶ 9 ("I know that Mr. MARTINEZ was hostile to

African-Americans. I saw it every day."); Amie Decl. ¶ 4 ("Mr. MARTINEZ was very much anti African-American."); Amie Decl. ¶ 14 ("I know that Mr. MARTINEZ was very hostile to African-Americans . . . ."); Ruiz Decl. ¶ 4 ("Mr. MARTINEZ had a very bad attitude toward women, minorities and particularly, towards African-Americans."). Vance objects to this evidence on the basis that it is conclusory and lacking in any supporting facts. *See* Def.'s Obj. at 6 (No. 8), 10 (No. 2), 13 (No. 8), 14 (Nos. 2-3). Vance is correct that there are cases stating that conclusory allegations are not enough to withstand summary judgment. *See, e.g.*, *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (stating that the object of Federal Rule of Civil Procedure 56(e) "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit"); *Lindsey v. Shalmy*, 29 F.3d 1382, 1385 (9th Cir. 1994) ("Mere conclusory assertions of discriminatory intent, embodied in affidavits or deposition testimony, cannot be sufficient to avert summary judgment."); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."); *Forsberg v. Pacific Northwest Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988) ("Purely conclusory allegations of alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment."). But the line between a conclusory allegation and admissible probative evidence of discriminatory intent is unclear. Based on the Ninth Circuit's holding in *Lindsey*, the above evidence offered by Mr. Harris is sufficiently specific to be accorded probative value. In *Lindsey*, the issue was whether there was a genuine dispute of material fact as to whether the defendant-supervisor's actions taken against the plaintiff were discriminatory on the basis of gender. The court concluded that there was. "Ronald J. Bradshaw, who had worked with Rives [the defendant-supervisor] on the Las Vegas Metropolitan Police Department stated that in 1978 Rives told him women did not belong in the workplace. Bradshaw also stated that Rives treated females with less respect than he treated males. Daniel R. Fitzpatrick, who was Director of the DBL [Department of Business License] in the early 1980's described the DBL environment as one in which it was difficult for women to advance. He characterized the DBL in the years immediately

following its transfer from the Sheriff's Office to the County, as a "good old boy network." Aubrey Weil, who worked with both Rives and Lindsey [the plaintiff] in the DBL from 1980 to 1985, stated that Rives had a 'misogynistic' dislike of Lindsey and treated her with more disdain than he treated the male agents in the DBL.  Finally, Ed Simms, who worked with Rives and Lindsey after Rives's promotion to Chief of Enforcement, stated that Rives 'had a tremendous amount of difficulty dealing with women and was, in fact, overly hostile and belligerent towards them. . . . [Except for Mrs. Jorgensen,] my perception is that he didn't get along with any of them.'  [¶] Alhough some of this information is dated, it is all relevant to the determination whether Rives's conduct was prompted by a gender-discriminatory motive. When combined with Lindsey's evidence concerning the actions taken by Rives, this evidence is sufficient to establish a genuine issue of material fact as to Rives's motive." *Lindsey*, 29 F.3d at 1385.  The instant case is similar to *Lindsey* in that, in the declarations of Mr. Harris, Ms. Amie, and Mr. Ruiz, provide more than a simple statement that Mr. Martinez is hostile to African Americans.  The allegations of Mr. Martinez's hostility towards African Americans is corroborated by more specific allegations -- *e.g.*, Mr. Harris testified about Mr. Martinez's use of the word "duckets," Ms. Amie testified about Mr. Martinez changing work schedules to favor Hispanics over African Americans, and Mr. Ruiz testified that there was no trouble until Mr. Martinez arrived.

B.  <u>Evidence of Employment Problems</u>

Vance's position, as noted above, is that Mr. Harris was terminated because of employment problems, not because of race discrimination.  Vance has submitted evidence of Mr. Harris's alleged employment problems through the declaration of Mr. Martinez.  In his declaration, Mr. Martinez testifies to both his personal knowledge of Mr. Harris's alleged employment problems as well as to his knowledge obtained through Mr. Harris's personnel file.

Mr. Harris makes a broad challenge to the admissibility of the bulk of the documents attached to the Martinez declaration, arguing that they are hearsay and that they do not fall under the business records exception.  *See* Pl.'s Obj. at 2 (No. 3) (objecting to Exhibits B, C, D, F, H, L, and M of the Martinez declaration); Opp'n at 2 (same).  The objections are overruled.

7

1  Federal Rule of Evidence 803(6) provides for the business records exception. It states that
2  the following is not excluded by the hearsay rule:

> (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed. R. Evid. 803(6).

Mr. Harris's main contention seems to be that, because Mr. Martinez is not Vance's custodian of records, he cannot establish that the documents fall under the business records exception. But, as is clear from the language of Rule 803(6), a person need not be a custodian of records; a person may testify so long as he or she is a "qualified witness." *Id.* The Weinstein treatise explains that what is needed is someone "who can explain the record-keeping of the organization." 5-803 Weinstein's Fed. Evid. § 803.08[8][a]. The treatise also notes that

> [t]he phrase "other qualified witness" is given a very broad interpretation. The witness need only have enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business. The witness need not have personal knowledge of the actual creation of the documents or have personally assembled the records. In fact, the witness need not even be an employee of the record-keeping entity as long as the witness understands the entity's record-keeping system.

*Id.*

In the instant case, Mr. Martinez has shown that he has a sufficient understanding of Vance's record-keeping system. He testified in his declaration that "Vance maintains personnel files regarding its employees in the regular course of its business. Those personnel files include any documentation regarding disciplinary action taken against an employee." Martinez Decl. ¶ 6. The objection is overruled.

Mr. Harris also objects to Exhibit M of the Martinez declaration on the basis that it is hearsay. Exhibit M is a "summary describing the racial background of the Security Officers

1   employed by Vance at the San Francisco Chronicle Site on January 16, 2008, about one year after
2   [Mr. Martinez] was hired." Martinez Decl. ¶ 16. The summary appears to be based on a review of
3   personnel records. The objection is overruled. Under Federal Rule of Evidence 1006, "[t]he
4   contents of voluminous writings, recordings, or photographs which cannot conveniently be
5   examined in court may be presented in the form of a chart, summary, or calculation." Fed. R. Evid.
6   1006.

   Having resolved the major evidentiary issues, the Court turns to the evidence of alleged employment problems submitted by Vance.

(1) According to Vance, *prior* to Mr. Martinez ever being hired, Mr. Harris already had a history of employment problems. First, on or about October 17, 2006, Mr. Harris left his security post before being relieved properly in violation of company policy. *See* Martinez Decl. ¶ 6 & Ex. B (disciplinary action form). Mr. Harris was given a verbal warning about this incident. *See* Martinez Decl. ¶ 6 & Ex. B (disciplinary action form). Second, on or about November 22, 2006, Mr. Harris failed to follow instructions and violated company policy by failing to give adequate notice of an absence from work. *See* Martinez Decl. ¶ 7 & Ex. C (disciplinary action form) (indicating that Mr. Harris called in only one hour before his shift was to begin). Third, on or about November 29, 2006, Mr. Harris changed his shift without informing his manager in violation of company policy. *See* Martinez Decl. ¶ 8 & Ex. D (disciplinary action form). Mr. Harris argues that the three disciplinary forms about these alleged incidents were fabricated. In support of this argument, Mr. Harris offers the declaration of Ms. Amie, who was his supervisor at the time. Each of the forms was purportedly signed by Ms. Amie, as Mr. Harris's supervisor, but Ms. Amie states in her declaration that she did not sign the forms and that Ms. Murphy (whose handwriting she recognizes) actually filled out the forms. *See* Amie Decl. ¶¶ 6-7. Ms. Amie also testified that there was a meeting about the forms held on November 29, 2006, which was attended by, *inter alia*, herself, Mr. Harris, Ms. Murphy, and the then-project manager Duane Wells. According to Ms. Amie, at that meeting, Ms. Murphy "admitted to everyone there that the reports . . . were fictitious and she promised to remove them from Mr. HARRIS's personnel

9

1   file." Amie Decl. ¶ 9. In her declaration, Ms. Amie further testified that "I know that Mr.
2   MARTINEZ directed Ms. MURPHY to alter Plaintiff's personnel file by placing these
3   fabricated forms therein." Amie Decl. ¶ 8. This statement, however, strains credulity when
4   it appears undisputed that Mr. Martinez did not begin working for Vance until January 2007.
5   *See, e.g.*, Ruiz Decl. ¶ 4 (noting that Mr. Martinez became project manager of the San
6   Francisco Chronicle Richmond site in January 2007). According to Mr. Harris, when he
7   reviewed his personnel file in April 27, 2007 (after he had been terminated), the forms were
8   not there. *See* Harris Decl. ¶ 11. Ms. Amie also suggests that the disciplinary action forms
9   were invalid because they did not have a case number, *see* Amie Decl. ¶ 6, even though there
10  is no space on the form for a case number. On the other hand, each form does have a space
11  for, *e.g.*, a statement by the employee and a signature by the employee, but there is no
12  employee statement or signature on any of the forms.
13  (2) According to Vance, after Mr. Martinez was hired and Ms. Murphy became Mr. Harris's
14  direct supervisor, another incident involving Mr. Harris occurred on or about February 23,
15  2007. *See* Martinez Decl. ¶ 9. On or about that day, Ms. Murphy claims to have seen both
16  Mr. Harris and another security officer standing outside waiting for a taxi. She could not
17  determine which one was properly relieved and both Mr. Harris and the other security officer
18  "insisted the other was relieved by officer Adjua." Martinez Decl., Ex. F (memo from Mr.
19  Martinez to Mr. Harris). But "no pass down was given to officer Adjua as he . . . stated
20  verbally to Ms. Murphy and [to Mr. Martinez]." Martinez Decl., Ex. F (memo from Mr.
21  Martinez to Mr. Harris). Ms. Murphy counseled Mr. Harris about this incident. *See*
22  Martinez Decl. ¶ 9. On or about March 5, 2007, there was subsequent counseling by Mr.
23  Martinez on the same incident as well as the body odor problem discussed below. *See*
24  Martinez Decl. ¶ 12 & Ex. G (memo, dated March 6, 2007, from Mr. Martinez to Human
25  Resources). Mr. Harris disputes Vance's contention that he abandoned his post because he
26  was properly relieved by another security officer on the day in question. *See* Martinez Decl.,
27  Ex. E (letter, dated February 28, 2007, from Mr. Harris to Human Resources); Martinez
28  Decl., Ex. G (memo, dated March 6, 2007, from Mr. Martinez to Human Resources).

(3) According to Vance, on or about February 26, 2007, two employees complained to Mr. Martinez about Mr. Harris's body odor. The two employees were Ms. Murphy and Arnita Turner, both African American women. *See* Martinez Decl. ¶ 10. As noted above, on or about March 5, 2007, Mr. Martinez counseled Mr. Harris about the problem. *See* Martinez Decl. ¶ 12 & Ex. G (memo, dated March 6, 2007, from Mr. Martinez to Human Resources). Mr. Ruiz, the San Francisco Chronicle site trainer, attended that counseling session. *See* Martinez Decl. ¶ 12; Ruiz Decl. ¶ 6. Mr. Harris disputes that he has a body odor problem, claiming that Ms. Murphy had in the past complimented him on his cologne. *See* Martinez Decl., Ex. I (letter, dated March 7, 2007, from Mr. Harris to Human Resources). Ms. Amie, in her declaration, confirms that she "heard Ms. MURPHY regularly compliment [Mr. Harris] on his choice of colognes." Amie Decl. ¶ 10. Ms. Amie further states that there was never any problem with Mr. Harris's body odor, *see* Amie Decl. ¶ 10, and, in his declaration, Mr. Ruiz states that he does not remember Mr. Harris "having a serious problem with hygiene." Ruiz Decl. ¶ 7. Mr. Ruiz questions the authenticity of the memo submitted by Vance in support of its motion, which he allegedly authored and which memorialized what happened during the counseling session. *See* Martinez Decl., Ex. H (memo by Mr. Ruiz). Mr. Ruiz notes that he did not sign the memo and that he is "not the author of [the memo] as written. I feel it was edited." Ruiz Decl. ¶ 7.

(4) Finally, according to Vance, on or about April 4, 2007, Mr. Martinez was told by a security control room operator that Mr. Harris had abandoned his post. Mr. Martinez spoke to the security guard who had been on duty with Mr. Harris, Israel Worton (also African American[2]). Mr. Worton confirmed that Mr. Harris had been missing for over two hours. Mr. Worton prepared an incident report regarding the abandonment. *See* Martinez Decl. ¶ 14 & Ex. L (incident report). After this incident, Mr. Martinez discussed with Human Resources the possibility of termination and ultimately the decision was made to terminate (who made the decision is not entirely clear). *See* Martinez Decl. ¶ 15. Mr. Harris argues

---

[2] *See* Harris Depo. at 64.

11

first that the incident report should not be considered because it is invalid. According to Mr. Harris, the report is invalid because security officers are not permitted to prepare reports about each other and because the report lacks a case number. *See* Amie Decl. ¶ 12. Vance disputes the former, noting that the Security Officer's Handbook does not contain such a limitation on incident reports. *See* Martinez Reply Decl., Ex. S (handbook). Mr. Harris also questions the validity of the complaint by Mr. Worton on the basis that there was no need to have two officers in the control room because the room was not a designated post. *See* Amie Decl. ¶ 13. Vance disputes this. *See* Martinez Reply Decl. ¶ 7 (stating that "the control room is indeed a post which required two security officers to be present"). Finally, Mr. Harris suggests that, even if he had been away from the post longer than the permitted hour to conduct a patrol, he was not away for as long as two hours or, if he was, it was because he was sick. *See* Harris Depo. at 141.

### III.  DISCUSSION

As stated above, the only remaining claims in this case are (1) disparate treatment based on race and (2) racial hostile work environment. Both are state law claims, *i.e.*, FEHA claims. California Government Code § 12940(a) governs claims for disparate treatment, providing in relevant part that it is unlawful

> [f]or an employer, because of the race . . . of any person . . . to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

Cal. Gov't Code § 12940(a). Section 12940(j)(1), in turn, governs claims for harassment, stating in relevant part that it is unlawful "[f]or an employer . . . , because of race, . . . to harass an employee, an applicant, or a person providing services pursuant to a contract." *Id.* § 12940(j)(1). According to the California Supreme Court, "[b]ecause of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." *Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317, 354 (2000).

A. <u>Disparate Treatment</u>

As the California Supreme Court has stated, "California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination . . . based on a theory of disparate treatment." *Id.*

At the first stage, the plaintiff must establish a prima facie case of discrimination. "This step is designed to eliminate at the outset the most patently meritless claims . . . ." *Id.* While "[t]he specific elements of a prima facie case may vary depending on the particular facts," as a general matter, "the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." *Id.* at 355; *see also Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 713 (2008) ("[T]he elements of a claim for employment discrimination in violation of section 12940, subdivision (a), are (1) the employee's membership in a classification protected by the statute; (2) discriminatory animus on the part of the employer toward members of that classification; (3) an action by the employer adverse to the employee's interests; (4) a causal link between the discriminatory animus and the adverse action; (5) damage to the employee, and (6) a causal link between the adverse action and the damage.").

If the plaintiff makes this prima facie showing, then "the burden shifts to the employer to rebut the presumption [of discrimination] by producing admissible evidence, sufficient to 'raise[] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason." *Guz*, 24 Cal. 4th at 355-56.

If the employer meets this burden, "the presumption of discrimination disappears" and the plaintiff must then "attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias." *Id.* at 356. A plaintiff may discredit an employer's proffered reason by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find that reason

unworthy of credence. *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). A plaintiff may also demonstrate pretext by showing that the employer treated similarly situated employees outside the plaintiff's protected class more favorably. *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) ("A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence. [¶] A showing that the County treated similarly situated employees outside Vasquez's protected class more favorably would be probative of pretext.").

In the instant case, Vance argues that, as a matter of law, Mr. Harris cannot establish either a prima facie case or demonstrate pretext.

1. Prima Facie Case

Regarding the prima facie case, Vance makes two arguments: (1) that there is no evidence from which a reasonable jury could find that Mr. Harris was qualified and (2) that there is no evidence suggesting a discriminatory motive. Neither argument is convincing.

As to Mr. Harris being qualified, there is declaration testimony from both Ms. Amie and Mr. Ruiz. Ms. Amie testifies in her declaration that Mr. Harris "had no disciplinary problems" and that "[h]e was prompt, well-dressed, and never left his post unless properly relieved." Amie Decl. ¶ 5. In turn, in his declaration, Mr. Ruiz testifies that Mr. Harris "was a good employee, prompt, loyal, hard-working, well-dressed and groomed, and a credit to the Company." Ruiz Decl. ¶ 9. Mr. Ruiz even goes on to state that he recently offered to hire Mr. Harris at the security company where Mr. Ruiz currently works. *See* Ruiz Decl. ¶ 9. While there is evidence presented by Vance to the contrary, the declarations from Ms. Amie and Mr. Ruiz by themselves are enough to raise a genuine dispute of material fact as to whether Mr. Harris was qualified.

As to discriminatory motive, there is adequate evidence to raise a disputed issue of fact. That evidence includes Mr. Martinez's use of the word "duckets" with specific reference to African Americans, Mr. Martinez's changing work schedules to favor Hispanics over African Americans, and Mr. Ruiz's testimony that Mr. Harris had no problems until Mr. Martinez was hired. *Compare Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438-39 (9th Cir. 1990) (noting that stray remarks or isolated comments unsupported by other evidence of discriminatory motivation will not create a

triable issue). There is additional evidence of discriminatory motive as discussed above including allegations that African Americans were replaced with Hispanics and that Mr. Martinez had a hostile attitude towards African Americans. Although Vance disputes much of that evidence – *e.g.*, whether Mr. Harris was replaced by a Hispanic or whether another African American employee was replaced by a person with the last name Hernandez – factual disputes must be resolved in Mr. Harris's favor for purposes of this motion.

      2.      <u>Justification and Pretext</u>

Vance argues that, even if Mr. Harris could establish a prima facie case, it has submitted evidence showing that his termination was based on poor performance and, as a matter of law, Mr. Harris has failed to present any evidence of pretext.

Vance has indeed advance neutral performance-based justification for Mr. Harris's termination as discussed above, including his abandonment of his shift, as well as a host of other performance issues. Thus, the burden shifts back to Mr. Harris to show pretext. Evidence of pretext advanced by Mr. Harris includes the following.

(1) When Mr. Martinez terminated Mr. Harris, he did not cite any performance problems as the reason for the termination. Rather, Mr. Martinez simply told Mr. Harris that there was a decision to cut back and that Mr. Harris was not a "'perfect fit.'" Harris Depo. at 154-55, 174; Harris Decl. ¶ 13.

(2) Charlie Brooks, a Caucasian employee, also violated company policy more than once but was never terminated for his conduct and instead was only written up – *i.e.*, he was treated more favorably. (Vance has never presented any evidence that Mr. Harris's claims about Mr. Brooks's discipline history is incorrect.)

(3) Mr. Harris could have been disciplined short of termination for any misconduct. Although Vance did not have an explicit policy requiring progressive discipline, its Security Officer's Handbook could implicitly be read as suggesting such discipline, *see* Martinez Decl., Ex. A at 70 (handbook) (describing different levels of disciplinary action – *i.e.*, counseling, written warning, suspension without pay, and then finally termination). Even if it were not mandatory, progressive discipline was not fully applied here.

1  (4)  Evidence that Mr. Harris's performance -- both before and after Mr. Martinez started
2       working at Vance -- was in fact not an issue, and that the allegations of poor performance
3       were fabrications. *See* Part II.B, *supra*.
4  (5)  Mr. Harris as well as other witnesses (*i.e.*, Ms. Amie and Mr. Ruiz) testified about Mr.
5       Martinez's hostile attitude towards African Americans and replacement of some African
6       Americans by Hispanics. The record is not sufficiently clear to negate testimony with
7       respect to the alleged replacement of some African Americans by Hispanics.

The evidence, viewed in Plaintiff's favor with all reasonable inferences drawn in his favor, is sufficient to establish both a prima facie case as well as pretext, notwithstanding evidence of a non-discriminatory basis for Mr. Harris's termination. Accordingly, the Court denies Vance's motion for summary judgment with respect to the disparate treatment claim.

B.  Hostile Work Environment

For a racial hostile work environment claim, a plaintiff must establish, *inter alia*, that he or she was harassed on the basis of race and that the harassment was "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Aguilar v. Avis Rent a Car Sys.*, 21 Cal. 4th 121, 130 (1999) (internal quotation marks omitted). "An employer is strictly liable for harassment committed by its agents or supervisors . . . ." *Jones v. Department of Corrections & Rehabilitation*, 152 Cal. App. 4th 1367, 1377 (2007).

In the instant case, Mr. Harris charges Mr. Martinez, his supervisor, with having created a racial hostile work environment. Vance argues in its motion for summary judgment that, as a matter of law, Mr. Martinez's conduct was neither sufficiently severe nor sufficiently pervasive to create such an environment.

Here, the undisputed evidence establishes that Mr. Martinez's conduct was not so severe as to constitute a hostile work environment. For example, although there is evidence that Mr. Martinez used the word "duckets" with reference to African Americans in suggesting they only cared about money, there is no evidence that he used other racial epithets or other words that are generally recognized as inflammatory or particularly hurtful. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (describing the n-word as "'perhaps the most offensive and inflammatory racial

slur in English'"); *cf. Aguilar v. Avis Rent a Car Sys.*, 21 Cal. 4th 121, 130 (1999) (noting that "not every utterance of a racial slur in the workplace violates the FEHA or Title VII"). Nor is there any evidence that Mr. Martinez assaulted, threatened to assault, or used any physical force against African American employees. *Cf. Herberg v. California Institute of the Arts*, 101 Cal. App. 4th 142, 151 (2002) (noting that "'even a single incident of severe harassment may be sufficient' to establish liability by an employer for sexual harassment" but adding that "such a single incident must be severe in the extreme and generally must include either physical violence or the threat thereof").

"[W]hen the harassing conduct is not severe in the extreme, more than a few isolated incidents must have occurred to prove a [hostile work environment] claim based on working conditions." *Lyle v. Warner Brothers Television Productions*, 38 Cal. 4th 264, 284 (2006). In other words, a plaintiff cannot establish pervasive harassment -- and therefore prevail on a hostile work environment claim -- where the harassment "is occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature." *Id.  See also Mokler v. County of Orange*, 157 Cal. App. 4th 121, 142 (2007) (noting that "[t]he required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct" and that "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal quotation marks omitted).

In the instant case, Mr. Harris failed to provide sufficient evidence to establish harassment so pervasive as to constitute a hostile work environment. There is no indication, for instance, that the "ducket" reference or any other form of verbal race-based harassment was used repeatedly. The evidence of discrimination has been described in Part II.A, *supra*, reflects that, at most, Mr. Martinez, in addition to the occasional use of offensive language made without explicit reference to African Americans, made four employment decisions adverse to African Americans and/or beneficial to non-African Americans (Ronald Tizon, Charlie Brooks, Jose Morales, and Officer Hernandez), and changed work schedules on an unspecified number of occasions to favor Hispanics as against African Americans. This evidence does not establish the kind of "continuous, pervasive harassment" found by courts to have created a hostile working environment. *See Mokler v. County*

1 *of Orange*, 157 Cal. App. 4th at 144-45 (concluding that three incidents that took place over a five-
2 week period, none of which involved a physical threat, fell short of establishing continuous,
3 pervasive harassment; the conduct was "rude, inappropriate, and offensive behavior" but that, "[t]o
4 be actionable, . . . a workplace must be permeated with discriminatory intimidation, ridicule and
5 insult") (internal quotation marks omitted). *Hope v. California Youth Authority*, 134 Cal. App. 4th
6 577, 589-90 (2005) (upholding jury finding on hostile work environment claim where, *inter alia*,
7 plaintiff was called derogatory names by his supervisor and others every day). *See also Etter v.*
8 *Veriflo Corp.*, 67 Cal. App. 4th 457, 467 (1998) (noting that "isolated incidents, such as the sporadic
9 use of abusive language, will not be actionable").

10 Mr. Harris points to the declaration of Mr. Ruiz, in which he states that "Mr. MARTINEZ
11 created a hostile environment at the Richmond site, making African-Americans uncomfortable,"
12 Ruiz Decl. ¶ 5. While evidence of Mr. Martinez's attitude may provide corroboration of Mr.
13 Martinez's discriminatory motive, as discussed *supra*, this allegation is too conclusory to establish a
14 hostile work environment at Vance. Mr. Ruiz's declaration provides no specifics about why there
15 was a hostile work environment. In short, Mr. Harris's evidence does not establish "severe or
16 pervasive" harassment sufficient to create an "abusive working environment." *Aguilar*, *supra*.

17 Accordingly, the Court grants summary judgment in favor of Vance on the hostile work
18 environment claim.

19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

### IV. CONCLUSION

For the foregoing reasons, Vance's motion for summary judgment is granted in part and denied in part. The motion is granted with respect to the retaliation claim and the claim for a hostile work environment. The motion is denied with respect to the disparate treatment claim.

This order disposes of Docket No. 22.

IT IS SO ORDERED.

Dated: June 3, 2009

_____
EDWARD M. CHEN
United States Magistrate Judge